## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ESTATE OF SAUL OFFIT, by Its Executor, Marc Offit, <br><br> *Plaintiff,* <br><br> v. <br><br> FINANCIAL CREDIT INVESTMENT III SPV-B (CAYMAN), L.P., <br><br> *Defendant.* | Case No. _____ |

## COMPLAINT

Plaintiff, the Estate of Saul Offit, by its Executor, Marc Offit (the "Estate"), brings this Complaint against Defendant, Financial Credit Investment III SPV-B (Cayman), L.P. ("FCI"), and in support thereof alleges as follows.

## INTRODUCTION

1.      This action involves an $8.5 million stranger-originated life insurance ("STOLI") policy (the "Policy"). It was procured on the life of Saul Offit in violation of Delaware's Constitution, insurable interest laws, and public policy.

2.      The Policy was originated and procured by a family of interrelated Delaware entities known generally as Coventry, which operated a STOLI program that generated large numbers of multi-million-dollar STOLI policies, including the Policy here.

3.      After Mr. Offit died in 2020, the Policy's death benefit was paid to and received by Wells Fargo Bank, in its capacity as the Policy's beneficiary of record and owner of record, and was then paid to and received by FCI, as the Policy's beneficial owner.

4.      Under Delaware's long-standing common law, as codified by 18 Del. C. § 2704(b), and as confirmed recently by multiple courts, including the Delaware Supreme Court, the Estate

is entitled to recover the Policy's death benefit from FCI, together with prejudgment interest. *See Wells Fargo Bank v. Estate of Malkin*, 278 A.3d 53, 61 (Del. 2022) ("Section 2704(b) confers standing on the estate and codifies the longstanding common-law rule that, if the insurer pays the death benefit on a policy that lacks an insurable interest, the estate may sue to receive that benefit.") (footnote omitted); *Estate of Barotz v. Vida Longevity Fund*, 2022 WL 16833545, at *12–13 (Del. Super. Ct. Nov. 9, 2022) ("*Estate of Barotz*") (granting summary judgment for estate of STOLI insured and awarding policy's death benefit, with prejudgment interest, to the estate), *aff'd*, 320 A.3d 212 (Del. 2024); *Lavastone Capital v. Estate of Berland*, 266 A.3d 964, 970-74 (Del. 2021) ("*Estate of Berland I*") (addressing certified questions and confirming that "if a death benefit is paid under an insurance policy that lacks an insurable interest, the estate of the insured may recover the death benefit from the recipient"); *Estate of Berland v. Lavastone Capital*, 2022 WL 15023450 (D. Del. Sept. 28, 2022) ("*Estate of Berland II*") (awarding, in light of the foregoing decision of the Delaware Supreme Court, STOLI policy's death benefit to the insured's estate, plus prejudgment interest); *Estate of Malkin v. Wells Fargo Bank*, 2022 WL 2285884, at *3 (11th Cir. 2022) (affirming judgment holding the recipients of the proceeds of a STOLI policy jointly and severally liable to the insured's estate).

## PARTIES

5.    Saul Offit was a citizen of Florida at the time of his death.

6.    FCI is a hedge fund structured as a private exempted limited partnership under the laws of the Cayman Islands. FCI is jointly owned by Berkshire Hathaway Life Insurance Company of Nebraska, a capital stock life insurance company incorporated under the laws of Nebraska, and Financial Credit Investment III Designated Activity Company, a private limited company incorporated under the laws of Ireland.

## JURISDICTION AND VENUE

7.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and because there is complete diversity of citizenship between the Estate, which is a citizen of Florida, and FCI, which is a citizen of Nebraska and of Ireland and which, to the best of the Estate's knowledge, is not a citizen of Florida.

8.     This Court has personal jurisdiction over FCI, and venue is proper in this District, for a number of reasons. At all times relevant to the claim asserted here, FCI was managed and operated by persons in Manhattan employed by Apollo Global Management, Inc. or affiliates thereof. Those persons, while in Manhattan, engaged in various activities with respect to the Policy, and in so doing acted for the benefit of, with the knowledge and consent of, and under some control by, FCI, which had hired those persons to manage and operate it. In 2017, they advised FCI to acquire the Policy from another entity that they managed and operated, Financial Credit Investment III Designated Activity Company. They advised FCI about, and advised FCI to execute with Financial Credit Investment III Designated Activity Company and with other entities, an Omnibus Assignment, Assumption and Release Agreement, dated November 13, 2017 and subject to a New York choice-of-law clause, by which the acquisition of the Policy was effected. They advised FCI to engage New York counsel—in particular, Paul, Weiss, Rifkind, Wharton & Garrison LLP—to represent it in that transaction and to engage in negotiations related to that transaction, and they communicated and interacted with Paul, Weiss on FCI's behalf. During the three years when FCI beneficially owned the Policy, they regularly conducted valuations of the Policy; on the basis of those valuations advised FCI to keep the Policy in effect and to continue to pay the Policy's premiums; determined the optimal amounts and dates of those premium payments; monitored the Policy and ensured that premiums were being paid in the amounts and on the dates that were deemed optimal; and communicated with and worked with FCI's Ireland-based

personnel about the Policy and other policies. After Mr. Offit died, they directed FCI's agent and securities intermediary, Wells Fargo Bank, to claim the Policy's death benefit and then to transfer the death benefit to FCI.[1]

9.      In addition to the foregoing, by virtue of the aforementioned November 13, 2017 Omnibus Assignment, Assumption and Release Agreement, FCI assumed the rights and obligations of Financial Credit Investment III Designated Activity Company under the May 1, 2017 Securities Account and Custodian Agreement between that entity and Wells Fargo Bank. Under that agreement, Wells Fargo Bank was purportedly obligated to serve as Financial Credit Investment III Designated Activity Company's securities intermediary with respect to the Policy and various other policies. The Securities Account and Custodian Agreement was subject to a choice-of-law clause selecting New York law and a forum-selection clause selecting this District as well as state courts sitting in New York City. Moreover, the Securities Account and Custodian Agreement made the securities intermediary's jurisdiction New York for purposes of the Uniform Commercial Code.

## **BACKGROUND**

10.      This action concerns a life insurance policy controlled by and subject to Delaware law, including because the Policy was a Delaware trust-owned life insurance policy as defined under Delaware's insurable interest statute, 18 *Del. C.* § 2704. More specifically, Delaware's insurable-interest statute defines a "trust-owned life insurance policy" as an insurance contract "issued for delivery in this State to a trust established under the laws of this State and having a trustee with its principal place of business in this State." § 2704(e)(4). Delaware's insurable interest statute further provides that a Delaware trust-owned life insurance policy "shall be

---

[1] The facts alleged in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

governed by [Delaware's insurable interest laws] without regard to an insured's state of residency or location." § 2704(e)(4), (g). Here, the Policy was issued for delivery to the Saul Offit 2006 Insurance Trust, a Delaware statutory trust dated February 8, 2006, and was in fact delivered in Delaware. Wilmington Trust Company, which has (and had) its principal place of business in Delaware, was the trust's trustee, and, as is reflected in a delivery receipt that it executed in Delaware, took delivery of the Policy in Delaware.

11.     As the Delaware Supreme Court has recognized: "Since the initial creation of life insurance during the sixteenth century, speculators have sought to use insurance to wager on the lives of strangers." *PHL Variable Ins. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059, 1069 (Del. 2011) ("*Price Dawe*"). Insurance policies that are procured by entities lacking an insurable interest in the life of the insured violate Delaware's insurable interest requirement and public policy. *Id.*

12.     Although human-life wagerers have existed for hundreds of years, never has the problem of human life wagering been more widespread or involved such vast amounts of money than in recent decades. In the early 2000s, institutional investors began pooling large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were securitized and sold to other investors. *See*, *e.g.*, Susan Lorde Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 192 (2010).

13.     At this time, however, there were not enough existing life insurance policies to satisfy investor demand. Investors were interested in high-face-amount policies insuring the lives of senior citizens, but there were only "a limited number of seniors who had unwanted policies of sufficiently high value." *Price Dawe*, 28 A.3d at 1070. "As a result, STOLI promoters sought to solve the supply side shortage by generating new, high value policies." *Id.*

14.    One such STOLI promoter was a family of interrelated Delaware entities known generally as "Coventry," which operated a large, Delaware-centered STOLI program that generated thousands of STOLI policies on the lives of senior citizens from all over the United States. As explained further below, Coventry operated what has come to be called a "back-end" STOLI scheme using non-recourse premium financing.

15.    Entities such as Coventry—known in the STOLI industry as "funders"—worked with a nationwide network of insurance producers, who, acting as the funders' agents, assisted the funders by, among other things, identifying senior citizens meeting the funders' investment criteria and influencing those seniors to become involved in the STOLI transactions the funders were orchestrating.

16.    The STOLI transactions orchestrated by these funders, including Coventry and its agents, were presented to hand-selected senior citizens in rosy terms that camouflaged the transactions' impropriety as a "risk-free" opportunity, "just a good deal," and similar to "hitting the lottery" or getting "bingo."

17.    The specific mechanisms by which each funder's STOLI program operated could and often did vary in one respect or another. But each shared basic similarities, including that the policies at issue were procured by third parties without an insurable interest in the insureds.

18.    STOLI policies violate insurable interest laws, take advantage of senior citizens, and operate to convert legitimate life insurance products—which are designed to provide actual protection to families and others with an interest in the continued life of insureds with a genuine need for protection—into cash machines for strangers to the insureds who are more interested in seeing them dead than alive.

**Coventry's Two-Year, Non-Recourse Premium Finance STOLI Scheme**

19.     Beginning in 2001, Coventry, Lavastone Capital LLC ("Lavastone"), and other parties entered into a series of requirements contracts through which Coventry agreed to originate a large number of Delaware life insurance policies that, from the start, were intended to be transferred to Lavastone and other investors.

20.     To manufacture these life insurance policies, Coventry's origination program followed a set pattern. Through a network of local insurance brokers around the country, Coventry located senior citizens to serve as the insureds on new life insurance policies that Coventry would procure on each insured's life.

21.     Coventry also routinely entered into non-exclusive agreements and other arrangements with local insurance brokers under which such brokers agreed to split with Coventry any commissions they received from the issuing insurance carriers, thus further adding to Coventry's financial incentive to originate new life insurance policies.

22.     Before any policy was applied for, Coventry would obtain a broad Special Irrevocable Durable Power of Attorney over the potential insured, giving Coventry the power to originate and/or to provide services for any life insurance policies on the insured's life. These powers included, but were not limited to, the power to complete and execute any applications or other documents in connection with the policies' maintenance or even liquidation.

23.     Before any policy was applied for, Coventry would obtain a life expectancy report on each potential insured. Coventry would then use the information from the report to perform its own underwriting of each prospective insured before a policy on that person's life was applied for. Among the purposes of this underwriting procedure was to project how long any potential insured might live, and thus how profitable to Coventry and other investors a prospective policy might be.

7

24.    Once Coventry determined that a particular insured was a suitable candidate for a policy, Coventry would dictate the terms under which a policy would be applied for. With the assistance of the local insurance brokers, Coventry would start the application process by having these local insurance brokers partially complete applications for policies to be issued by insurance carriers chosen by Coventry.

25.    Once an insurance carrier made a preliminary underwriting decision about a particular prospective insured, Coventry would create and fund (sometimes with no more than a single dollar) a Delaware statutory trust in the insured's name to apply for and become the owner and beneficiary of any potential policy on an insured's life. Coventry would create and fund each Delaware trust by directing the local insurance broker to have the insured execute a number of boilerplate and non-negotiable Coventry trust documents and to nominally fund each Delaware trust, typically with one dollar. The Delaware trusts would have no other assets, would be established by and for Coventry, and typically were expressly not intended to serve any valid estate planning need for the insureds.

26.    Coventry would also have the insureds execute separate trust agreements whereby Coventry would create a second Delaware trust for each policy, called a sub-trust. Under the terms of the sub-trust agreements, all assets of the initial trusts were immediately transferred and assigned to the sub-trusts, including any and all future rights or interests in any life insurance policy on the insured's life procured by Coventry through the Delaware trusts.

27.    With regard to all of the Delaware trusts, Coventry would choose the trustee, which in most, if not all, cases was Wilmington Trust Company, a corporate trustee located in Delaware. Coventry's form trust agreement granted broad powers to Coventry's chosen trustee, including the ability to cause the sub-trust to enter into a so-called "loan" whereby Coventry would pay all

premiums for any policy on the prospective insured's life. The trustee was also given the power to assign to Coventry the sub-trust's assets, including any future interest in any life insurance policy.

28.     Once this was all in place, Coventry, acting through its local insurance broker, would cause the broker to submit a formal application to the insurance carrier that had been selected by Coventry. The formal application would identify the Delaware trust in the insured's name as both the owner and beneficiary of the policy being applied for; explain that the trust had been formed in Delaware; and further explain that the initial application was signed by the insured and the trustee in Delaware. The formal application would also identify the name of the Delaware corporate trustee, with an address in Delaware.

29.     The formal application would not, however, identify the existence of the sub-trust; Coventry's involvement in the transaction; the fact that Coventry was actually paying the policy's premiums; the fact that Coventry was receiving consideration, including half of the commissions; or the fact that Coventry had previously entered into a series of contracts under which it was engaged and was required to "originate" life insurance policies for resale to other investors.

30.     The policy itself would then be issued by the Coventry-selected insurance carrier for delivery to the Delaware corporate trustee of the Delaware trust owner. The Delaware corporate trustee would then execute a policy delivery receipt in Delaware, acknowledging actual physical delivery and legal acceptance of the terms of the policy in Delaware, thus creating a Delaware trust-owned insurance policy controlled by Delaware law.

31.     Through its so-called "loan" with the sub-trust, Coventry would then pay the policy's premium by wire transfer, which allowed Coventry to continue to conceal its involvement in the origination and procurement of the policy. Under the terms of Coventry's "loan," Coventry

obtained an immediate assignment of and control over, among other things, any policy issued to the trust and conveyed to the sub-trust.

32.     But the so-called "loan" to the sub-trust was a sham. It was structured with a 26- or 30-month term with no genuine obligation for anyone to repay and no recourse to the insured. Additionally, the "loan" carried excessive interest, fees, and expenses, and was in effect designed to discourage its repayment. Indeed, the "loan" did not need to be repaid at all. Instead, the "loan" was designed so that at the end of the term, all rights and interests in both the Delaware trust that owned the policy and the sub-trust—specifically including all rights and interests in the policy—could simply be irrevocably relinquished to Coventry in full satisfaction of the "loan" and then sold by Coventry to Lavastone pursuant to the pre-existing contractual arrangement, and Lavastone would either hold the policy until maturity or resell it to another investor. Alternatively, the policy in question could be sold to Coventry for an amount in excess of the loan balance (and then sold by Coventry to Lavastone pursuant to the pre-existing contractual arrangement) or sold to a third-party for an amount in excess of the loan balance, with the sale proceeds being used to repay the loan. Either way, the thousands of policies originated by Coventry ended up in almost all instances, and as had been intended from the outset, owned by speculators with no insurable interest in the lives of the insureds.

33.     Every court that has considered Coventry's scheme under Delaware law has held, as a matter of law, that (i) the Coventry program was a STOLI program, and (ii) policies originated through the program are void *ab initio*. *See, e.g.*, *Estate of Barotz*, 2022 WL 16833545, at *12–13, *aff'd* 320 A.3d at 212; *Estate of Daher v. LSH*, 2024 WL 3571642, at *3, 6 (C.D. Cal. July 23, 2024) (determining on summary judgment that Coventry-procured policy was STOLI and thus void *ab initio* under Delaware law); *U.S. Bank v. Estate of Albart*, 2023 WL 7491131 (Fla. 5th Cir.

Ct. Oct. 23, 2023) (same); *Estate of Diamond v. U.S. Bank*, 2023 WL 6392688 (Fla. 15th Cir. Ct.

Sept. 15, 2023) (same); *Estate of Berland II*, 2022 WL 15023450 (same); *Estate of Malkin v. Wells

Fargo Bank*, 379 F. Supp. 3d 1263 (S.D. Fla. 2019) (same); *Sun Life v. U.S. Bank*, 369 F. Supp.

3d 601 (D. Del. 2019) (same); *U.S. Bank v. Sun Life*, 2016 WL 8116141 (E.D.N.Y. Aug. 30, 2016),

*adopted* 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017) (same); *Sun Life v. U.S. Bank*, 2016 WL

161598 (S.D. Fla. Jan. 14, 2016), *aff'd* 693 F. App'x 838 (11th Cir. 2017) (same).

## The Policy on the Life of Mr. Offit

34.    In or around February 2006, Hartford Life and Annuity Insurance Company

("Hartford") received an application for a universal life insurance policy on the life of Mr. Offit,

who was then 71 years old.

35.    The application identified the owner and beneficiary of the proposed policy as the

Saul Offit 2006 Insurance Trust (the "Trust"). It described the trustee as Wilmington Trust

Company, located at 1100 North Market Street, Wilmington, DE 19890.

36.    The application was signed on behalf of the Trust in Wilmington, Delaware by a

senior financial services officer for Wilmington Trust Company, as trustee of the Trust and owner

and beneficiary of the prospective policy.

37.    After receiving the application, Hartford issued the Policy, which bore policy

number U01587685 and which provided $8,500,000 in coverage.

38.    Hartford received a delivery receipt for the Policy executed in Wilmington,

Delaware by a financial services officer for the Trust's trustee, Wilmington Trust Company.

## The Policy Lacked an Insurable Interest and Was Procured
## Illegally on Mr. Offit's Life

39.    The Policy lacked an insurable interest at its inception, and was procured on Mr.

Offit's life as part of a STOLI scheme in violation of Delaware's Constitution, Delaware's

common law, Delaware's insurable interest statute, and Delaware's public policy. Any appearance of insurable interest was superficial only.

40.    Coventry acted through its agents to have the application for the Policy submitted to Hartford. To facilitate the transaction, Coventry created the Trust as a Delaware trust, installed Wilmington Trust Company as the trustee of the Trust, and used the Trust as a cover to procure the Policy without a valid insurable interest.

41.    The Trust was a sham and used as a cover because it was nominally funded and was created as a means of concealing from the insurance carrier the fact that it was being used to feign technical compliance with Delaware's common law and statutory insurable interest laws.

42.    Coventry also created a sub-trust to the Trust. The sub-trust was also established as a mere cover for procuring the Policy without a valid insurable interest.

43.    In connection with originating the Policy, Coventry, acting through LaSalle Bank, N.A., entered into a non-recourse "loan" arrangement with the Trust, with the Policy serving as the sole collateral for the purported "loan."

44.    The purported "loan" was secured solely by a security interest in the Trust and sub-trust that held the Policy.

45.    As a result of the purported "loan," neither Mr. Offit nor anyone with an insurable interest in his life ever paid any premiums on the Policy. Rather, the loan was used to conceal from the insurance carrier the fact that such premiums were paid by Coventry for the purpose of creating a wager on Mr. Offit's life.

46.    Moreover, the purpose of the Policy was not to provide estate protection for Mr. Offit or his family. Rather, Mr. Offit was used as an instrumentality whereby strangers with no insurable interest could wager on his early demise.

47.     In 2009, approximately two years after the Policy was issued, stranger investors unrelated to Mr. Offit took formal control of the Policy. Thereafter, the Policy traded hands on the secondary market. In 2017, FCI, through the aforementioned Omnibus Assignment, Assumption and Release Agreement, acquired the Policy and became its beneficial owner. FCI continued to hold the Policy, and to pay its premiums, until Mr. Offit's death in 2020.

48.     As noted above, since 2016, multiple courts have considered the Coventry scheme under Delaware law and have unanimously concluded that Coventry operated a STOLI scheme and procured policies lacking insurable interest under Delaware law. Thus, when FCI acquired the Policy in 2017, FCI knew, or should have known, that the Policy had been procured without an insurable interest and in violation of Delaware law.

49.     FCI, through its agents, repeatedly invaded Mr. Offit's privacy by contacting him to determine whether he was still alive and to check on the status of his health.

50.     Multiple state insurance departments have condemned STOLI schemes as offending senior citizens' human dignity and as subjecting the straw insureds to various other harms, including the violation of their privacy through intrusive contact like that described above, and by misusing their private medical information to maximize their bets on the insureds' lives.

### After Mr. Offit Died, FCI Received the Policy's Death Benefit

51.     On November 28, 2020, Mr. Offit died.

52.     Hartford subsequently received a claim for the Policy's death benefit to be paid to Wells Fargo, as the Policy's beneficiary of record. It accepted the claim and accordingly paid the Policy's death benefit to Wells Fargo, in the amount of $8,519,095.89 (representing the Policy's face amount of $8,500,000.00 plus accrued interest of $19,095.89). Wells Fargo received those proceeds on January 4, 2021, and on January 5, 2021 transferred them to FCI, as the Policy's

beneficial owner, in accordance with Wells Fargo's obligations under the aforementioned May 1, 2017 Securities Account and Custodian Agreement.

<b>The Estate Initially Asserted Its Cause of Action in the<br>Superior Court of the State of Delaware</b>

53.    On May 12, 2023, in an action brought in the Superior Court of the State of Delaware by the Estate and by other estates similarly situated, the Estate asserted against FCI the same cause of action as is being asserted here. *See Estate of Boggess, et al. v. Viva Capital 3 LP, et al.*, Del. Super. Ct., C.A. N23C-05-130.

54.    On November 1, 2023, FCI brought a motion in that proceeding to dismiss the Estate's cause of action for lack of personal jurisdiction, arguing that the requirements of Delaware's long-arm statute could not be met and that subjecting FCI to jurisdiction in Delaware would not comport with the federal due process clause. The Estate opposed the motion.

55.    On June 21, 2024, the Delaware Superior Court issued an order granting FCI's motion as to the Estate's claim. On January 2, 2026, that order became final.

<b><u>COUNT I</u></b>

<b>RECOVERY OF INSURANCE PROCEEDS DUE TO LACK OF INSURABLE<br>INTEREST</b>

56.    The Estate hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

57.    The Policy was applied for, and the application was signed, in Delaware by a Delaware statutory trust, as the Policy's prospective owner and beneficiary. The Policy was then actually delivered to the trustee of the Trust, Wilmington Trust, in Wilmington, Delaware. For these and other reasons, the Policy is governed by Delaware law. 18 *Del. C.* § 2704(e)(4), (g).

58.    For the reasons set forth above, the Policy lacked an insurable interest.

59.    Where an insurance company pays the death benefit on a policy lacking an insurable interest, the insured's executor or administrator is entitled to recover such benefits from the beneficiary, assignee, or other payee that received the benefits as a matter of common law and statute. *See* 18 Del. C. § 2704(b); *Estate of Malkin,* 278 A.3d at 61.

60.    The Policy's death benefit was paid to and received by FCI.

61.    As a consequence, the Estate is entitled to receive the amount of that death benefit, plus applicable interest, from FCI.

## PRAYER FOR RELIEF

WHEREFORE, the Estate respectfully requests that this Court enter judgment against FCI in an amount equal to the Policy's death benefit proceeds, *i.e.*, $8,519,095.89, plus prejudgment interest at Delaware's legal rate under 6 Del. C. § 2301(a) running from January 5, 2021, compounded quarterly; and that the Court grant such other monetary or equitable relief as the Court deems just and proper.

Dated: New York, New York
　　　　January 26, 2026

　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　**COZEN O'CONNOR**

　　　　　　　　　　　Matthew L. Elkin
　　　　　　　　　　　3 WTC, 175 Greenwich Street, 55th Floor
　　　　　　　　　　　New York, New York 10007
　　　　　　　　　　　212.509.9400
　　　　　　　　　　　melkin@cozen.com

　　　　　　　　　　　- and -

　　　　　　　　　　　Gregory J. Star (*PHV application forthcoming)*
　　　　　　　　　　　Matthew Bleich (*PHV application forthcoming*)
　　　　　　　　　　　Benjamin Kampf (*PHV application forthcoming*)

1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 665-2000

*Counsel for Plaintiff, Estate of Saul Offit*